O'DELL v. GOFF.

1. WILLS—TESTAMENTARY CAPACITY — DELUSIONS — FOUNDATION —EVIDENCE—SUFFICIENCY.

In proceedings to probate a will, contested on the ground that testator's belief in the illegitimacy of his son was an insane delusion, evidence examined, and *held*, that there was some evidence that testator's belief in contestant's illegitimacy which influenced the making of the will was produced by spiritualistic communications.

2. SAME—EVIDENCE—ADMISSIBILITY.

A deposition filed in a suit for divorce, brought by testator in another State against contestant's mother, in which the witness testifies to her infidelity before contestant was born, is admissible to prove that testator had good grounds to doubt the paternity of his child, there being a presumption that testator knew what the deposition contained.

3. SAME—SPIRITUALISTIC BELIEF—EFFECT.

A belief in spiritualism, like belief in any other form of religion, affords no evidence of insanity.

4. SAME—MONOMANIA.

A will made in consequence of a monomania, produced by testator's thinking so continually and persistently upon the subject of spiritualism as to be incapable of reasoning where

that subject is concerned, is void for lack of testamentary capacity.[1]

5. SAME—SPIRITUALISTIC COMMUNICATIONS—EFFECT.

A will made in consequence of such extraordinary confidence in spiritualistic communications that testator was impelled to follow them blindly and implicitly is not testator's will, and is not admissible to probate, and it is immaterial whether this conclusion rests upon the ground of absence of testamentary capacity or upon the ground of undue influence.

6. SAME—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.

In proceedings to probate a will, evidence examined, and *held*, that there was evidence that testator was a monomaniac upon the subject of spiritualism, that in making his will he was influenced by spiritualistic communications which he was incapable of resisting, and that there was therefore evidence of undue influence.

7. SAME—SPIRITUALISTIC FAITH—EVIDENCE.

In proceedings to probate a will, contested on the ground of incapacity and undue influence induced by monomania on the subject of spiritualism, the truth or falsity of the spiritualistic faith is not in issue, and witnesses should not be permitted to testify that testator was a monomaniac merely because he believed in spiritualism.

8. SAME—INSANITY—EVIDENCE—ADMISSIBILITY.

Refusal to permit proponents to prove by one who was duly qualified that there was nothing irrational from the standpoint of a spiritualist in testator's belief that a medium in a trance might do him harm was error, since such testimony would tend to remove from the minds of the jury the impression which might otherwise exist that the particular belief was evidence of insanity.

9. SAME—WITNESSES—CROSS-EXAMINATION—RELIGIOUS BELIEFS.

A witness for contestant, who had testified to lack of testamentary capacity, could not be cross-examined upon the subject of other religions and their effect on testamentary capacity.

10. SAME—DISCRETIONARY RULINGS.

It was discretionary with the court to refuse to compel one of contestant's witnesses to state upon cross-examination which of several circumstances indicating insanity was, in his judgment, the most significant.

---

[1]As to belief in spiritualism, witchcraft, etc., as affecting capacity to make will or deed, see note to *Lewis* v. *Arbuckle* (Iowa), 16 L. R. A. 677.

11. SAME — PATERNITY — EVIDENCE — PERSONAL RESEMBLANCE —
HARMLESS ERROR.

Whether evidence of contestant's resemblance of testator was
competent will not be decided upon a record that conclu-
sively establishes paternity in testator, that being the only
issue to which the testimony was applicable.

12. SAME—DECLARATIONS OF TESTATOR — ADMISSIBILITY.

Declarations of testator tending to prove lack of testamentary
capacity made after the making of the will are admissible.

13. COSTS—APPEAL—PROLIX BRIEF.

Where an excessively prolix brief is filed by appellant, costs
on reversal will include only so much thereof as would have
been sufficient to amply present his case.

Error to Cass; Coolidge, J., presiding. Submitted
April 13, 1906. (Docket No. 6.) Decided July 13,
1907.

B. O'Dell and others presented for probate the last will
and testament of John F. Goff, deceased. The will was
allowed in the probate court, and Leslie Goff appealed to
the circuit court. There was judgment for contestant,
and proponents bring error. Reversed.

*A. Lynn Free* (*M. L. Howell*, of counsel), for appel-
lants.

*Lyle & Eby* and *Harsen D. Smith* (*Victor M. Gore*,
of counsel), for appellee.

CARPENTER, J. This suit is brought to secure the
probate of the will of John F. Goff, deceased. The pro-
ponents are the executors named in said will. The con-
testant is the son of the testator. The will in question
was made November 3, 1885, when the testator was 66
years old. It has a codicil made September 23, 1897, at
which time the testator was 78 years of age. Testator
died in 1904, when he was 85 years of age. The will and
codicil disposes of testator's entire estate, aggregating in
value $41,000. The residue — constituting the bulk of
the estate — is bequeathed "to be used as a nucleus in

founding, building and equipping a home for poor and aged mediums." Only $1,800 is given to contestant, who is described as testator's "reputed son." It should also be stated—and this is an important circumstance—that spiritualistic mediums whom the testator had been in the habit of consulting, and through whom he received spiritualistic communications, received small legacies. Testator was married August 6, 1854, to contestant's mother. In May, 1855, he commenced suit for divorce in the circuit court for the county of Cass, in chancery, charging her with adultery. This suit was dismissed by stipulation, and the parties resumed their marital relations. Contestant, the son, was born in September, 1855. August 5, 1856, testator again commenced suit for divorce. This time he filed his bill in the circuit court for Elkhart county, Ind., and a decree of divorce was granted on the ground of desertion on the 17th of October, 1856.

After the granting of said last-mentioned divorce— which I think it may be assumed was invalid—Mrs. Goff and contestant, her son, went to California to live. There she remarried, and died in 1870. The testator has always believed and insisted that his wife was guilty of adultery, and that contestant was not his son.

He was a man of more than usual business ability. When the Indiana divorce was granted, he was worth only $3,000 or $4,000, and when he died, as already mentioned, he had accumulated an estate of $41,000.

When the will was made, and for many years prior thereto, and from that time until he died, he was a firm believer in the doctrine of spiritualism. He believed that the spirits of the departed communicated with him, not only through mediums, but directly. He believed that he talked with the apostles. He believed in the materialization of spirits and other spiritualistic phenomena, and one witness testified that he said his will was dictated by spirits. The trial court charged the jury that they might render a verdict finding that the instrument in question was not the last will and testament of John Goff, upon either of the following three grounds:

*First.* That John Goff was "at the time of making the will laboring under an insane delusion in regard to the paternity of his child, which governed or controlled him in the execution of his will. In the same connection is also involved the question whether he was laboring under an insane delusion that his wife had been guilty of adultery."

*Second.* That the will was "the result of undue influence over the mind of John Goff, manifested by the belief that communication from deceased persons had advised him how to make his will by adopting such communications as his guide in making the will and to the exclusion of his own free will and choice."

*Third.* That John Goff was "a monomaniac upon the subject of spiritualism to such an extent and intensity as to produce that mental derangement which rendered him incapable of comprehending and appreciating the natural objects of his bounty."

The jury rendered a verdict in contestant's favor. We are asked to reverse the judgment entered upon said verdict on various grounds, which, so far as needful, we will discuss.

*First.* Insane delusion: Was the belief of testator that he was not the father of contestant an insane delusion? It was certainly a delusion; for on this record we are bound to say that contestant was testator's son. (This subject will again be noticed in this opinion.) Was this delusion an insane delusion? That was a question submitted to the jury. Proponents contend that there was no evidence to warrant the submission of this question, because, they say, "there is no evidence that tends to show" that this delusion was produced by testator's belief "in spiritualism or in spirit communications." We content ourselves with saying there is such testimony. Proponents insist—and in this they may be right—that testator believed in his wife's adultery and contestant's illegitimacy before he became a spiritualist. But there is testimony indicating that he would not have continued to

believe in said illegitimacy as he did when the will was made had he not received and given implicit credit to spiritualistic communications informing him that contestant was not his son. In short, there is evidence that testator's belief in contestant's illegitimacy which influenced the making of the will was produced by spiritualistic communications.

In this connection, we discuss certain objections to the admission and exclusion of testimony relating to this delusion. There was found in the files in the divorce proceedings of the Indiana court a deposition of William P. Bennett (an old and deceased resident of Cass county), wherein he testified that testator's wife, Rowena Goff, admitted in his presence that she committed adultery with several men at different times and places while she was living with testator and many months before the boy—contestant—was born. This deposition was admissible, not to prove the facts testified to by the witness, but to prove that testator had good grounds to duobt the paternity of his child. The trial court held it not admissible for this purpose, because there was no evidence that testator had ever seen the deposition. In so deciding the court proceeded upon the assumption that the jury could not infer that the testator, the complainant in the suit, was informed of the testimony which he introduced to establish it. This assumption was erroneous. It is to be presumed that he knew of it. While I have found no case in which this principle is announced, it is recognized in the following: *Richards* v. *Morgan*, 4 Best & S. 641; *Blanchard* v. *Hodgkins*, 62 Me. 119. Other objections to rulings excluding and admitting testimony upon the subject of insane delusion are made. They are not well taken and require no discussion.

*Second.* Did testator's belief in spiritualism destroy his testamentary capacity? His belief in spiritualism was not evidence of insanity. *Bonard's Will*, 16 Abb. N. Y. Prac. (N. S.) 128; Rood on Wills, § 129; *In re Spencer*, 96 Cal. 448; *Will of J. B. Smith*, 52 Wis. 543;

*Buchanan* v. *Pierie*, 205 Pa. 123. One accepts his religious faith on evidence that is satisfactory to his mind. A court of law will never inquire whether that faith is sound or unsound. It does not possess the machinery for executing such an undertaking. It will content itself with saying—and that is sufficient for the purposes of this case—that one's religious faith affords no evidence of insanity.

It does not follow, however, that one may not have such a faith in spiritualism as to destroy his testamentary capacity. He may think so continually and persistently upon this subject as upon many other subjects as to become a monomaniac, incapable of reasoning, where this subject is concerned. In that case it should be said that a will made in consequence of such monomania is void for lack of testamentary capacity. *Orchardson* v. *Cofield*, 171 Ill. 14 (40 L. R. A. 256). So, too, a believer in spiritualism may have such extraordinary confidence in spiritualistic communications—whether those communications reach him through mediums or are received by him as he believes directly—that he is impelled to follow them blindly and implicitly, his free agency is destroyed, and he is constrained to do against his will what he is unable to resist. A will made under such circumstances is obviously not the will of testator, and is therefore not admissible to probate. We need not speculate as to the ground upon which this conclusion rests. It is utterly unimportant whether it rests upon the ground of absence of testamentary capacity, or, as held by the trial court, upon the ground of undue influence. See, also, *Robinson* v. *Adams*, 62 Me. 369. It is sufficient to say that a will brought about by an influence which the testator could not resist is not his will.

Tested by the foregoing principles, which were recognized by the trial court, it cannot be said that there was no evidence upon which these issues should have been submitted to the jury. Indeed, we do not understand that it is claimed that there was no evidence tending to prove

that testator was a monomaniac on the subject of spiritualism. There certainly was such testimony. There was testimony tending to prove that testator's faith in spiritualism had led him to many strange conclusions; for instance, that on one occasion a spirit brought him a crisp new $5 bill, and that on another occasion a spirit—designated by him as an evil spirit—tried to take his life with a butcher knife when he was lying in bed. There is evidence, too, that his mind dwelt upon the subject of spiritualism so persistently and profoundly as to make him incapable of reasoning when that subject was concerned. In short, there was evidence tending to prove that he was a monomaniac upon the subject of spiritualism. It is claimed, however, that there was no testimony tending to prove that the will was procured by undue influence. Undue influence as here used means that spiritualistic communications overcame the testator's mind, and compelled him to make the will in question. There certainly was testimony tending to prove that in making the will testator was influenced by spiritualistic communications. And it is a significant circumstance (see *Matter of Beach*, 23 App. Div. [N. Y.] 411), already alluded to, that many of these communications came through mediums who are both directly and indirectly beneficiaries in the will. From testator's actions and declarations the inference might be drawn that he was incapable of resisting the influence of these communications. There was therefore evidence of undue influence.

In this connection we consider objections to rulings admitting and excluding testimony upon the subject of testamentary capacity. As the truth or falsity of the spiritualistic faith was not at issue in this suit, it was proper for the trial judge to exclude testimony tending to prove it true—herein is included testimony showing the foundation upon which spiritualism rests—and it was improper for him to admit, as he did, testimony tending to prove it untrue. For the same reason, it was improper for contestant's counsel to suggest during the taking of the testi-

mony and to argue at the conclusion of the testimony that spiritualism was untrue. According to the foregoing rule, witnesses should not have been permitted to testify that testator was a monomaniac merely because he believed in spiritualism. Generally speaking, this rule was regarded. I think, however, in the case of contestant's witness George Longsduff this rule was disregarded. The witness himself testified on cross-examination:

"My definition of a 'monomaniac' [and he had testified that testator was a monomaniac] would include any spiritualist who believed that they could receive communications from the departed."

The court refused to permit proponents to prove by one who was duly qualified to give such testimony that there was nothing "irrational from the standpoint of a spiritualist in the belief of John Goff [and he had such a belief] that a medium in a trance might do him harm." This was error. The excluded testimony would tend to remove from the mind of the jury the impression which might otherwise exist that the particular belief above referred to was evidence of insanity.

We have examined the other complaints respecting the rulings admitting and excluding testimony upon the question of testamentary capacity. None of these rulings were prejudicial. Most of them were clearly correct. As an instance of such rulings, we mention the refusal of the court to permit proponents' counsel to cross-examine certain witnesses of contestant, who had testified to lack of testamentary capacity, upon the subject of other religions and their effect on testamentary capacity. This ruling was correct. See *In re Hogmire's Appeal*, 108 Mich. 410. Other rulings related to questions within the discretion of the trial court. As an instance of these latter rulings, we mention the refusal of the court to compel one of contestant's witnesses upon cross-examination to state which of several circumstances indicating insanity was, in his judgment, the most significant.

*Third.* Testimony that contestant resembled testator:

Contestant was permitted to prove by various witnesses that he resembled testator. The purpose of this testimony was to prove that testator was contestant's father. Proponents contend that this testimony was incompetent. This is a question which, upon this record, we are not called upon to determine; for the testimony was not prejudicial. It could be prejudicial only upon the assumption that the jury used it as evidence that contestant was testator's son. Their use of the testimony for that purpose would not injure proponents, because upon this record the fact that contestant was testator's son was conclusively established. Contestant was born in lawful wedlock, and there is no evidence whatever that his mother committed adultery (though there is evidence that testator entertained that belief). It will be perceived that, according to our ruling, it was quite unnecessary for the contestant to introduce the testimony under consideration, and the trial court might properly have excluded it, and he may properly exclude it upon a second trial if the record is like the one before us, because it relates to an issue which the jury will not be called upon to determine.

*Fourth.* Declarations of testator after the making of the will: Complaint is made because the trial court permitted contestant to prove various declarations of testator tending to prove lack of testamentary capacity made after the making of the will. This testimony was properly admitted under the rule recognized in *Spencer* v. *Terry's Estate*, 133 Mich. 39.

Proponents' brief is a printed volume containing 269 pages. In taxing costs contestant will be required to pay only for a brief of 80 pages. Such a brief would have been ample and more serviceable.

Judgment reversed, and new trial ordered, with costs.

McAlvay, C. J., and Grant, Blair, and Moore, JJ., concurred.